## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

LINDA N.,[1]

    *Plaintiff,*

    v.

KILOLO KIJAKAZI, ACTING
COMMISSIONER OF SOCIAL
SECURITY

    *Defendant.*

No. 3:23-cv-00064 (MPS)

## RULING ON PENDING MOTIONS

In this social security benefits case, the Administrative Law Judge ("ALJ") found that Plaintiff, Linda N., was not disabled under the Social Security Act ("SSA"). Plaintiff appeals the Commissioner's denial of benefits, challenging the ALJ's evaluation of Plaintiff's testimony about her symptoms and his determination that she had the Residual Functional Capacity to perform medium exertion work. Because I find that the ALJ's decision was supported by substantial evidence, I grant the Commissioner's motion to affirm the decision, ECF No. 17, and deny Plaintiff's motion to reverse, ECF No. 14.

### I.     FACTUAL BACKGROUND

I assume familiarity with Plaintiff's medical history, as summarized in her statement of facts, ECF No. 14-1 at 2-8, which the Commissioner incorporates and supplements, ECF No. 17-1 at 2-9, and which I adopt and incorporate by reference.  I also assume familiarity with the five

---

[1] As set forth in the January 8, 2021 Standing Order, the Plaintiff is identified by her first name and last initial. *See* Standing Order Re: Social Security Cases, No. CTAO-21-01, (D. Conn. Jan. 8, 2021).

sequential steps used in the analysis of disability claims, the ALJ's opinion, and the record.[2]  I

cite only those portions of the record and the legal standards necessary to explain the ruling.

## II.      STANDARD OF REVIEW

The Court "may vacate the agency's disability determination only if it is based on legal

error or unsupported by 'substantial evidence'—that is, if no reasonable factfinder could have

reached the same conclusion as the ALJ." *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022).

> The substantial evidence standard is a very deferential standard of review — even
> more so than the clearly erroneous standard . . . Substantial evidence is such
> relevant evidence as a reasonable mind might accept as adequate to support a
> conclusion . . . In determining whether the agency's findings were supported by
> substantial evidence, the reviewing court is required to examine the entire record,
> including contradictory evidence and evidence from which conflicting inferences
> can be drawn . . . If evidence is susceptible to more than one rational
> interpretation, the Commissioner's conclusion must be upheld . . . The substantial
> evidence standard means once an ALJ finds facts, [the Court] can reject those
> facts only if a reasonable factfinder would *have to conclude otherwise.*

*Id.* at 74 (internal quotation marks and citations omitted, emphasis in original); *see also*

*Richardson v. Perales*, 402 U.S. 389, 401 (1971) ("Substantial evidence" means "more than a

mere scintilla." (citation omitted)).

## III.     DISCUSSION

Plaintiff challenges the ALJ's determination that she had the Residual Functional

Capacity ("RFC") to perform work at medium exertion and was therefore capable of performing

her past relevant work ("PRW") as a Certified Nursing Assistant and a Home Attendant as those

jobs are generally performed. ECF No. 14-1 at 10.

"[A]n individual's RFC is an assessment of an individual's ability to do sustained work-

related physical and mental activities in a work setting on a regular and continuing basis."

*Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (citation and internal quotation marks

---

[2] Citations to the administrative record, ECF No. 8, appear as "R." followed by the page number appearing in the
bottom right-hand corner of the record.

omitted). I "must affirm an ALJ's RFC determination when it is supported by substantial evidence in the record." *Barry v. Colvin*, 606 Fed. App'x 621, 622 n.1 (2d Cir. 2015) (summary order) (citations omitted). "An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits [the court] to glean the rationale of an ALJ's decision[.]'" *Cichocki*, 729 F.3d at 178 n.3 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

Based on the record, including the Plaintiff's hearing testimony and other statements, the ALJ found that,

> [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except [Plaintiff] is limited to lifting or carrying 50 pounds occasionally and 25 pounds frequently; to standing or walking with normal breaks for a total of six hours in an eight hour workday; to sitting with normal breaks for a total of six hours in an eight hour workday; to only frequent climbing of ramps or stairs, crouching, or crawling; to never climbing of ladders, ropes, or scaffolds; to only frequent overhead reaching on the right; and to needing to be able to avoid concentrated exposure to hazards such as machinery or heights and no exposure to unprotected heights and hazardous machinery.

R. 21.

When the ALJ determined Plaintiff's RFC, he followed the "two-step process for evaluating a claimant's assertions of pain and other limitations" required by the governing regulations. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). First, the ALJ must "decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Id.* (citing 20 C.F.R. § 404.1529(b)). Second, the ALJ must consider "the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record." *Id.* (internal quotation marks and alterations omitted). Here, the ALJ concluded that though Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged

symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 22.

Plaintiff argues that the ALJ "failed to incorporate several critical factors in his RFC description." ECF No. 14-1 at 10-11. Specifically, Plaintiff claims the record shows that she has foot and shoulder conditions, exacerbated by her obesity and diabetes, that prevent her from doing medium exertion work. She also claims that she needs additional breaks due to pain and urinary incontinence. Plaintiff argues that, if the ALJ had considered all the relevant evidence, he "should have limited [her] to at most light exertion, because she is not able to perform the standing, walking, and lifting demands of medium exertion work." *Id.* at 11.

In reaching his conclusion that Plaintiff has the RFC to perform medium exertion work, the ALJ considered the entire record, including (1) Plaintiff's statements about her capacity (2) Plaintiff's work history, (3) Plaintiff's medical records, (4) the exacerbating effect of Plaintiff's obesity, diabetes, and sleep apnea, and (5) the opinion of two state agency expert reviewers. Based on this record, I find that the ALJ's determination was supported by substantial evidence.

## A. Plaintiff's Statements

The ALJ considered Plaintiff's statements about pain she experiences in her foot and shoulder. R. 21-22. These statements included Plaintiff's December 2020 disability report, which "primarily alleged physical difficulty due to a pain in her shoulder." R. 21; *see* R. 267-68. Plaintiff had surgery on her right shoulder to repair her rotator cuff before the alleged onset of her disability. R. 20; R. 681 (doctor who conducted September 17, 2020 consultative examination stating that surgery occurred "3 years" before the examination); R. 44 (Plaintiff discussing the surgery). Plaintiff testified that the last time she went to the doctor, her right

4

shoulder "hurt so bad" when touched that the doctor "thought [she] was gonna die" and had to end the examination. R. 44-45. She said she takes Tylenol for the pain. R. 45. Plaintiff claims that her shoulder pain has been exacerbated by her part-time work as a Certified Nursing Assistant ("CNA") for a disabled patient. R. 42-45. Her work requires her to wash and dress her patient, who weighs approximately 280 to 290 pounds. R. 43. She must "turn [the patient] and . . . flip her back over . . . to change her." R. 42-43. During this process, she relies on the patient's cooperation: the patient can "move if she wants to," but if she refuses, Plaintiff must wait until the patient's husband "come[s] home to help . . . push [the patient] over." R. 52. Plaintiff also helps the patient stand and walk. R. 43. There is no Hoyer lift in the patient's room, so she pulls the patient up "with [her] right shoulder." R. 43. The patient can "walk a little bit," but "all the weight is . . . on [Plaintiff] to help her." R. 43. As she must do much of her work "with [her] right hand," R. 45, she experiences pain and soreness in her right arm, R. 44-45.

Plaintiff also claims that pain in her feet prevents her from standing or walking for lengthy periods of time. R. 22; R. 46-48. In her disability report, she stated that her "right foot [is] shorter than [her] left one." R. 231. In her testimony, she referred to her right "leg" being shorter than her left, and she claimed that this discrepancy causes pain in her right foot. R. 45 ("[T]he doctor said my right leg is way shorter than my left leg. All these years . . . . I was putting all my weight on my right leg. And now that I'm getting older, it's . . . affecting my walking. I can't really stand up that long and walk a lot."). She testified that her doctor advised her to "walk like, 10, 15 minutes, take a break. And then get up and start again." R. 45.

Plaintiff also told the ALJ that her diabetes contributes to her foot pain, because her ankle "swells up real big." R. 52; *see also* R. 44 ("I'm diabetic and my foot is swelled up. The doctor told me I can't do much walking. If I walk 15, 20 minutes, the whole week I gotta tiptoe on my

foot just to go to the bathroom or do dishes or whatever I gotta do"). She claims she provided her previous employer with a doctor's note indicating that she needed to sit down "every chance [she got]." R. 46. Though she had been working for that employer for 27 years, he told her, "[W]e can't use you now. 'Cause 'a my foot . . . . When you're doing CNA work, you can't sit down. You gotta be on foot all day." R. 46. She currently works 18 hours a week for her current employer, the husband of the patient she cares for. R. 44. She testified that she can do this work because her employer permits her to sit and elevate her foot "when the ankle starts swelling up." R. 52; *see also* R. 49 ("[The employer will] let me sit. He will always say, sit down, take your time. When I get there, he notice that I'm walking, limping. He says, sit down before you go in the room with [the patient].").

The ALJ considered Plaintiff's claim that the pain in her feet and shoulders prevents her from walking more than 30 yards at a time, standing for more than 30 minutes, or carrying more than 20 pounds. R. 21; R. 46-48; R. 50 (Plaintiff testifying that she can "stand in one place without holding . . . about 30 minutes"); R. 271 (Plaintiff's disability report stating that she can walk past "7 houses" in her neighborhood before resting and lift 20 pounds). The ALJ also noted that Plaintiff indicated she had difficulty "lifting, walking, bending, kneeling, climbing stairs, and reaching." R. 21; R. 271.

The ALJ partially credited Plaintiff's statements about her "shoulder and foot pain," finding that these conditions warranted "some functional limitations." R. 24 (determining plaintiff was limited to "the demands of medium exertion," to "frequent overhead reaching with her right upper extremity," and to "frequent crouching, crawling, and climbing of ramps or stairs, but never climbing ladders, ropes, or scaffolds"). However, the ALJ found that Plaintiff's claims about the "intensity, persistence, and limiting effects" of her conditions were "not entirely

consistent" with her description of her part-time work or with the medical record. R. 22. He therefore declined to impose "greater functional limitations," R. 24.

### B. Part-Time Work

The ALJ concluded that Plaintiff's part-time work "tends to reflect [that she] retains the ability to initiate, sustain, and complete work like activities with the bilateral upper extremities." R. 21. He found it "notabl[e]" that Plaintiff "was responsible for lifting [a] 280-290 pound patient without the assistance of a lift." R. 22. And elsewhere, he observed that Plaintiff "does heavy exertion helping her patient to stand, walk, and bathe, approximating that the patient she supports weigh[s] 280 to 290 lbs." R. 22.

Plaintiff objects to the ALJ's consideration of her part-time job, arguing that his description indicates that he "did not understand the demands of [Plaintiff's] . . . part-time job." ECF No. 14-1 at 13. Specifically, she claims her testimony does not support the ALJ's claim that she was "responsible for lifting [a] 280-290 pound patient," since her testimony suggests that the patient "does not need to be lifted and 'can stand a little bit . . . [and] can walk, but she can't walk far.'" *Id.* (quoting R. 22, 43). But the ALJ's opinion indicates that he had a nuanced understanding of the plaintiff's job responsibilities. *See* R. 22 ("[Plaintiff] indicates that she does heavy exertion *helping* her patient to stand, walk, and bathe . . . [T]he patient she *supports* weigh[s] 280 to 290 lbs." (emphasis added)). And Plaintiff's testimony supports the ALJ's conclusion that Plaintiff was responsible for lifting and supporting much of the patient's weight. *See* R. 43 ("[ALJ:] So, what's the heaviest weight you'd have to lift or carry in a typical workday? [Plaintiff:] Oh, [the patient's] weight. She's about, I think about 280 or 290?"); R. 43 ("I have to  . . . pull her up with my right shoulder . . . ."); R. 43 ("[The patient] can stand a little bit . . . but she can't walk as far. All the weight is like on me to help her."); R. 42-43 ("I . . . wash

and dress her . . . . I gotta push her with my right hand. And now my arm is sore from pushing on

her to turn her and to flip her back over . . . to change her and stuff.").

Plaintiff also argues that the ALJ should not have weighed her part-time work against

her, because (1) "ALJs should not draw conclusions about a claimant's ability to work full time

based on part-time employment when the claimant's employer is tolerant of and accommodating

[of her] disability," ECF No. 14-1 at 13 (quoting *Lanigan v. Berryhill*, 865 F.3d 558, 564-65 (7th

Cir. 2017), and (2) working "makes a claimant more credible, not less," *id.* (quoting *Cullinan v.

Berryhill*, 878 F.3d 598, 604 (7th Cir. 2017)).

Contrary to Plaintiff's assertions, "[a]n ALJ's consideration of a claimant's part-time

work is entirely proper and may support an ALJ's decision to discount a claimant's credibility."

*Durante v. Colvin*, No. 3:13-CV-01298 (HBF), 2014 WL 4852881, at \*20 (D. Conn. Aug. 7,

2014), *report and recommendation adopted*, No. 3:13-CV-01298 (JCH), 2014 WL 4843684 (D.

Conn. Sept. 29, 2014) (internal citation and quotation marks omitted). In this case, the ALJ

"acknowledged that Plaintiff needed accommodations" to perform her part-time work, and "took

Plaintiff's limitations into consideration." *Silva v. Saul*, No. 18-CV-06206, 2019 WL 2569595, at

\*5 (W.D.N.Y. June 21, 2019); *see* R. 22 (recognizing that Plaintiff "indicated that she manages

to work part-time doing this work as the client permits her to sit; whereas, other employers

require her to stand for longer periods"). Plaintiff's testimony that she supported the weight of a

280- to 290- pound patient—even with an accommodation that permitted her to sit when her feet

were swollen—supports the ALJ's determination that she was capable of medium exertion work,

including that she was capable of "lifting or carrying 50 pounds occasionally and 25 pounds

frequently," R. 21.[3] Thus, the ALJ did not err in considering this evidence when determining the credibility of Plaintiff's statements about her capacity.

### C.  Medical Evidence of Foot and Shoulder Pain

The ALJ also determined that Plaintiff's claims about her foot and shoulder pain were not "entirely consistent" with her medical records. R. 22. In particular, the ALJ noted that Plaintiff received "limited . . . acute treatment" for issues with her feet and shoulders following several falls, R. 24, but most of this treatment occurred "[p]rior to the relevant period," R. 22. After the alleged onset of her disability in 2019, the ALJ found, Plaintiff received "minimal treatment related to the condition of [her] feet and shoulders." R. 22.

The ALJ acknowledged and considered the treatment that Plaintiff received for her feet and shoulders in 2016 and 2017. R. 22. During this period, Plaintiff had surgery on her right rotator cuff. R. 22; R. 72. In March of 2016, Plaintiff "had an MRI of her right ankle, which identified insertional tendinopathy with marrow edema, partial fatty atrophy, and mild osteoarthropathy." R. 22; R. 356, 358 (March 10, 2016: Plaintiff reported "left ankle pain with ambulation," and examination found edema in Plaintiff's right ankle); R. 301 (March 16, 2016: "[right] ankle pain and swelling for the past year. Acquired pes planus"; MRI showed "[m]ild osteoarthropathy of the [right] second tarsometatarsal joint"). In April of 2017, "[Plaintiff] sought emergency treatment after a trip and fall," where she "hit her right arm and head against a fence" and broke her left big toe. R. 22; R. 305-07 (April 5, 2017: Plaintiff "fell while w[al]king,

---

[3] Plaintiff also claims that her assertions about how much she can lift are supported by "sports science." ECF No. 14-1 at 15. Plaintiff cites "Stengthlevel.com," which estimates that, "for the barbell curl . . . a 60-year-old female [who is a beginner weightlifter] is expected to be able to lift 11 pounds." *Id.* (citing *see* Strengthlevel.com, Female Strength Standards, available at: https://strengthlevel.com/strength-standards/female/lb). Aside from Plaintiff's unsupported claim that the barbell curl is more related to "work-type lifting" than any other form of lifting, this website is not part of the record and Plaintiff offers no reason to believe its estimates are credible. Nor are the website's contents relevant: the ALJ must determine Plaintiff's actual capacity, not the average capacity for people of her age or body build. *See* SSR 96-8P, 1996 WL 374184 (July 2, 1996) ("Age and body habitus are not factors in assessing RFC. It is incorrect to find that an individual has limitations beyond those caused by his or her medically determinable impairments and any related symptoms, due to such factors as age and natural body build . . . .").

tripped and tried to catch herself, right arm went through fence . . . left foot pain"; on examination, doctor found "[d]ecreased range of motion" and "tenderness" in her right shoulder). In June of 2017, Plaintiff "tripped and fell [again], this time complaining of pain in her left foot and shoulder." R. 22; R. 312 (June 1, 2017: "[Plaintiff] has pain to the left anterior shoulder aggravated by range of motion attempt . . . . She has mild pain to the left great toe, she had a fracture of that toe several months ago"). Based on these records, the ALJ concluded that Plaintiff's treatment for her foot and shoulder largely consisted of "limited . . . acute treatment following falls." R. 24.

In more recent years, however, the ALJ observed that "the medical records capture minimal treatment related to the condition of [Plaintiff's] feet and shoulders." R. 22. Indeed, at several medical appointments from 2019 through 2021, treatment providers reported that Plaintiff's extremities were normal, that she had "normal gait," and that she did not have edema/swelling in her feet, or any other symptoms of high or low blood sugar. R. 20, 22-23; *see e.g.*, R. 555, 557-58 (March 22, 2019: "[Plaintiff] denies symptoms of high or low blood sugars"; "Pain level: 0"; "Extremities: normal Symmetric,[]well perfused")[4]; R. 548, 550-51 (April 30, 2019: "Pain level: 0"; "[n]o swelling of feet" on foot exam; Plaintiff says she is "active w/ walking"); R. 454 (August 7, 2019: "Edema not present"); R. 544 (October 8, 2019: "No muscle aches"; "Pain Level: 0"); R. 724-25 (June 24, 2020: "[Plaintiff] feels well . . . . [Plaintiff] denies . . . edema"; exam negative for "lower extremity edema"; "Gait – Normal"); R. 701-04 (July 1, 2020: "[Plaintiff] denies symptoms of high or low blood sugars"; "Extremities: normal Symmetric,[ ]well perfused");    R. 689-90 (November 25, 2020: "No muscle aches"; "Extremities: normal Symmetric,[ ]well perfused"; "Gait and Stance: Normal"); R. 740, 742-43

---

[4] During this same examination, Plaintiff's primary care physician reported that Plaintiff "has feet that are cold . . . usually worst at night." R. 555. He advised Plaintiff to "wear socks at night" and "return [if] this (cold fee) continues to bother her." R. 559.

(April 7, 2021: "[Plaintiff] denies symptoms of high or low blood sugars"; No muscle aches"; "Extremities: normal Symmetric,[ ]well perfused"); R. 736 (May 7, 2021: "Extremities: normal Symmetric,[ ]well perfused"). These records support the ALJ's conclusion that Plaintiff received minimal treatment for her alleged foot and shoulder pain after her 2017 falls. [5]

The ALJ recognized that Plaintiff "reported two months of shoulder pain exacerbated with her lifting at work" in September of 2021. R. 22; *see* R. 864 ("[Plaintiff] . . . has 2 months of right shoulder pain the pain is achy 8/10 worst with use. She uses it when she cares for her patients . . . ."); R. 44-45 ("You know, when I went to the doctor last time, he touch[ed] [my right shoulder], he thought I was gonna die. And he had to stop."). But the ALJ correctly noted that Plaintiff had "normal results upon musculoskeletal and neurological examination" during that visit. R. 22; *see* R. 867-69 (doctor noting normal result and not recommending any treatment for Plaintiff's right shoulder). The ALJ also found it "notabl[e]" that Plaintiff's work required her to "lift[] [a] 280-290 pound patient." R. 22.

In addition to records from Plaintiff's treating physicians, the ALJ considered the results of Plaintiff's September 17, 2020 consultative examination with Dr. Jacob Yacov Kogan. R. 22-23. During the examination, Plaintiff told Dr. Kogan about her history of shoulder surgery, but she also indicated that she was not receiving "ongoing treatment." R. 22; R. 681 (Dr. Kogan

---

[5] I note that the ALJ's opinion does not mention one medical record that discusses Plaintiff's foot pain. On November 7, 2017, Plaintiff told Kettly Cassamajor, APRN, that she had "chronic pain in [her right] foot," and "right foot discomfort with activities," and requested a "referral to [a] podiatrist for evaluation for diabetic shoe[s], which helped in the past." R. 586. During a foot examination, Cassamajor found "swelling of the feet" and "[r]ight foot discomfort." R. 588. The record also suggests that Plaintiff has a podiatrist for routine diabetes mellitus foot care. R. 694 (August 13, 2020: "[Plaintiff] is present for [diabetes mellitus] foot care" but "states she has a podiatrist on the outside and refused care"); R. 701 (July 1, 2020: "[Plaintiff] states she is up-to-date for foot visit"). Plaintiff reported that she goes to a podiatrist for treatment of her "right foot condition." R. 236 (Plaintiff's disability report stating that she has been seeing a podiatrist for 10 years and had another visit scheduled for June of 2020). The medical records also indicate that Plaintiff has a history of "acquired pes planus," *see, e.g.* R. 301; R. 542, and the ALJ found that condition severe, R. 18. Still, the ALJ's statement that Plaintiff received "minimal treatment" for her feet after her falls in 2017 is supported by substantial evidence. As noted, Plaintiff's providers have repeatedly reported no swollen feet or ankle edema since 2017. Several doctors reported Plaintiff had pes planus, or flat feet, but there is no record of Plaintiff receiving any care for that condition. *See* R. 81. And if in recent years Plaintiff has reported foot pain to her podiatrist, or any other doctor, that evidence is not part of the record.

reporting that Plaintiff had not seen her shoulder surgeon for 2.5 years and had last received physical therapy "following her [right] shoulder surgery . . . but not since then"). Plaintiff told Kogan "she did not use pain medications, a cane, or braces." R. 22; R. 681. During his examination, Dr. Kogan found "no evidence" of a "discrepancy in the length of [Plaintiff's] legs." R. 19; R. 683. He also reported that Plaintiff had "no ankle edema," "well healed arthroscopic surgical scars at the [right] shoulder," "full range of motion . . . throughout all the joints of the upper and lower extremities bilaterally," "normal muscle bulk and tone in the upper and lower extremities bilaterally," and a "normal" gait. R. 682-83; R.22 (discussing some of these results).

Dr. Kogan did note that Plaintiff reported "tenderness to palpation involving the entire posterior torso and all four extremities diffusely." R. 682; R. 22. But these results were "inconsistent with multiple patches throughout the upper and lower extremities bilaterally reported as simultaneously intact to pin prick and not intact to pinprick with repeated testing and with no specific physiological pattern established." R. 683; R. 22-23. Dr. Kogan also found that Plaintiff had "limited effort on strength testing," although "she was approximated to have a slight deficit in motor strength." R. 23; R. 683 ("There is limited effort and giveway weakness involving the proximal and distal muscles of the upper and lower extremities bilaterally. At maximal effort, strength approaches at least 4+/5 through all the above muscle groups.").

In sum, the medical record offers substantial support for the ALJ's determination that Plaintiff overstated the "intensity, persistence, and limiting effects" of her foot and shoulder pain. R. 22. The ALJ was "not obligated to accept without question [Plaintiff's] testimony about her limitations and symptoms, but has discretion to evaluate [her] credibility in light of the evidence in the record." *Suttles v. Colvin*, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order). Here, the

ALJ was justified in discounting Plaintiff's claims about her foot and shoulder conditions. The ALJ did not err in concluding Plaintiff did not have a "discrepancy in the length of her legs," since the "consultative examiner did not identify any evidence of this difference," and the claim was not otherwise "supported by objective evidence." R. 19. Nor did the ALJ err in determining that Plaintiff's foot and shoulder pain were not as severe as she described. While there is evidence in the medical record that Plaintiff experienced foot pain and shoulder pain in 2016 and 2017—a period when she was working full-time in a CNA job that required heavy exertion, R. 25; R. 233—the record supports the ALJ's conclusion that Plaintiff has received minimal care for foot and shoulder pain since 2017. On multiple physical examinations from 2019-2021, doctors have reported that Plaintiff has a normal gait, is not experiencing pain, and does not have swollen feet. And the ALJ also noted that Plaintiff told the consultative examiner that she does not use pain medications, a cane, or a walker. R. 22. The ALJ could reasonably conclude, based on this evidence, that Plaintiff is capable of medium exertion work.

Plaintiff argues that the ALJ's analysis of her foot and shoulder conditions failed to "evaluat[e] [her] pain and consider[] the seven factors relevant to pain including: 1) daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of medications; 5) treatment, other than medications; 6) other measures used to alleviate pain; and 7) other factors." ECF No. 14-1 at 14. I disagree. As I have explained, the ALJ did consider Plaintiff's pain, ultimately determining that her "shoulder and foot pain" justified functional limitations. R. 24. In evaluating how disabling pain is, an ALJ "may consider" the "seven factors" Plaintiff mentions. *Dowling v. Berryhill*, No. 16-CV-04784, 2018 WL 472817, at *8 (E.D.N.Y. Jan. 18, 2018); *see also* 20 C.F.R. § 404.1529(c)(3) ("Factors relevant to your symptoms, such as pain, which we

will consider include: [the seven factors].”). But in this case, the ALJ considered each of the seven factors, including Plaintiff's daily work activities, her testimony regarding the pain she experienced, and the treatment she received. Plaintiff has pointed to no relevant factor that the ALJ overlooked.

Plaintiff also contends that the ALJ did not address Plaintiff's testimony that she "needs additional periods of rest in her workday due to pain," because her ankles and feet swell. *Id.* at 15. Specifically, Plaintiff claims the "ALJ's failure to consider [Plaintiff's] need to elevate her leg, or to ask a Vocational Expert how a leg-elevation requirement would affect [her] job prospects is error." *Id.* at 16.

"Although an ALJ is not obligated to specifically address each piece of evidence in his decision," he must "set forth his[] reasoning in such a manner so as to 'enable [reviewing courts] to decide whether the determination is supported by substantial evidence.'" *Arbarchuk v. Colvin*, No. 14-CV-00450, 2015 WL 5714262, at *4 (W.D.N.Y. Sept. 29, 2015) (citation omitted). The ALJ's opinion meets this standard. While the ALJ did not make specific findings regarding Plaintiff's allegation that her feet swell, his opinion makes clear that he did not find Plaintiff's testimony regarding her foot pain entirely credible. He considered medical records showing limited treatment of Plaintiff's ankles and feet, along with Plaintiff's testimony that "she manages to work part-time . . . as [her] client permits her to sit; whereas, other employers require her to stand for longer periods." R. 22. He concluded that Plaintiff's "conditions are not as limiting as alleged," although he found her foot pain "warrant[s] some functional limitations." R. 24. And he found that Plaintiff has the RFC to stand or walk "with normal breaks for a total of six hours in an eight-hour workday." R. 21. Since the ALJ did not find that Plaintiff needed additional periods of rest during the workday, there was no need to ask the Vocational Expert

about how such breaks would affect her job prospects. The ALJ's reasoning is sufficient to "enable [me] to decide whether the determination is supported by substantial evidence." *Arbachuk*, 2015 WL 5714262, at *4.

For the reasons explained above, the ALJ adequately considered and explained his reasoning regarding Plaintiff's foot and shoulder pain, and substantial evidence supports his determination that Plaintiff's foot and shoulder conditions do not prevent her from performing medium exertion work.

### D. Evidence of Other Conditions

While Plaintiff testified that her foot and shoulder conditions were the primary causes of her functional limitations, the ALJ also considered whether other conditions might warrant additional functional limitations. The ALJ determined that Plaintiff's hypertension, obesity, diabetes, and sleep apnea were, among others, "severe impairments," R. 18, and that these conditions "exacerbate" Plaintiff's "foot and shoulder problems." R. 24. The ALJ found that two other conditions, urge incontinence and depression, were not severe. R. 18. Plaintiff argues that the ALJ failed to adequately consider her diabetes, obesity, and urge incontinence. ECF No. 14-1 at 13-15.

<u>Diabetes</u>

First, Plaintiff disagrees with the ALJ's determination that her diabetes was "adequately controlled." ECF No. 14-1 at 13 (quoting R. 23). I find that the ALJ's conclusion about Plaintiff's diabetes was supported by substantial evidence.

In his opinion, the ALJ recognized that Plaintiff had "records of . . . glucose monitoring for diabetes," and took certain drugs to manage her diabetes. R. 23. But he noted that Plaintiff's records "primarily" describe Plaintiff's diabetes as being "without complications," though the

record sometimes mentions "unspecified complications." R. 20; *see, e.g.*, R. 552 (April 30, 2019: Plaintiff is "Clin[i]cally stable for diabetes with [hemoglobin A1C] at 7.6 . . . NO complications"); R. 725 (June 24, 2020: describing Plaintiff as having "Type 2 diabetes mellitus without complications"); R. 710 (June 16, 2020: same); R. 558 (March 22, 2019: same); R. 565 (February 22, 2019: same); R. 584 (February 9, 2018: same). *But see* R. 869 (September 22, 2021: listing Plaintiff as having both "Type 2 diabetes mellitus without complications" and "Type 2 diabetes mellitus with unspecified complications"); R. 546 (October 8, 2019: same); R. 699 (July 16, 2020: describing Plaintiff as having "Type 2 diabetes mellitus with unspecified complications"); R. 705 (July 1, 2020: same). The ALJ determined that Plaintiff's diabetes was "primarily treated as part of [Plaintiff's] medical history, supporting an inference that this condition was adequately controlled." R. 23; *see* R. 681 (June 17, 2020: "[Plaintiff] reports a history of diabetes mellitus diagnosed for 10 years, currently managed on Metformin, Jardiance, Victoza, Humalog insulin"); R. 478 (August 7, 2019: "[Plaintiff] has past medical history of Diabetes mellitus"); R. 457 (August 8, 2018: same); R. 611 (June 26, 2017: same). The ALJ also pointed out that Plaintiff's "file does not reflect evidence of loss of strength or sensation related to his condition," R. 23, or "evidence of hyperglycemia or hypoglycemia with evidence of retinopathy, nephropathy, or neuropathy," R. 20. *See* R. 370, 373, 550, 681-84, 689, 805.

Plaintiff argues that the medical record showed her diabetes "has never been fully controlled," since her hemoglobin A1C test results "indicat[e] moderate to poor control." ECF No. 14-1 at 14; *see* R. 691 (noting that hemoglobin A1C result of 7 - 9% indicates "[m]oderately controlled diabetes"); R. 868 (September 22, 2021: A1C was 8.4%); R. 590 (November 25, 2020: A1C was 8.3%); R. 715 (June 17, 2020: A1C was 7.6%); R. 737 (April 11, 2019: A1C was 8.8%); R. 545 (February 26, 2019: A1C was 7.6%). She also objects to the ALJ's

characterization of her diabetes as "part of [her] medical history," since she "has frequent follow-ups and daily insulin management." ECF No. 14-1 at 13-14.

The ALJ could reasonably conclude, based on the evidence in the record, that Plaintiff's diabetes was "adequately controlled." While Plaintiff had regular follow-ups to monitor her diabetes and took certain drugs to manage her condition, the record supports the ALJ's determination that her diabetes was generally stable. *See, e.g.*, R. 552 ("[Plaintiff is] [C]lin[i]cally stable for diabetes with [hemoglobin A1C] at 7.6 . . . NO complications"); R. 816 ("[Plaintiff] denies symptoms of high or low blood sugars"); R. 733 (same); R. 835 (same). Beyond the A1C test results, Plaintiff points to no medical records that suggest she had significant complications related to her diabetes. And as noted, the ALJ did not entirely discount Plaintiff's diabetes, finding that it was a "severe impairment[]" that "exacerbate[s]" Plaintiff's "foot and shoulder problems." R. 18, 24.

<u>Obesity</u>

Next, Plaintiff contends that the ALJ erred in failing to "factor in [her] obesity when determining the aggregate impact of [her] impairments." ECF No. 14-1 at 15 (quoting *Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012)). But the ALJ explicitly considered whether Plaintiff's obesity "magnif[ied] [her] remaining physical conditions," R. 23, ultimately determining her obesity exacerbates her "foot and shoulder problems," R. 24. Thus, the ALJ adequately considered "whether obesity, in combination with other impairments, prevents [Plaintiff] from working." *Fox v. Astrue*, No. 6:05-CV-01599, 2008 WL 828078, at *11 (N.D.N.Y. Mar. 26, 2008).

Urinary Incontinence

Plaintiff also argues that the ALJ should have made findings regarding whether Plaintiff's urge incontinence required her to spend "additional time off-task for cleanup." ECF No. 14-1 at 15. The ALJ determined that Plaintiff's urge incontinence was not a severe condition, because Plaintiff has received "minimal treatment, apart for recommended use of bladder control pads," and has not "alleged any functional limitations related to this condition." R. 18; *see* R. 747 (February 9, 2021: Plaintiff reporting that she is "urinating fine without [medications]"); R. 48 (Plaintiff not mentioning urge incontinence during testimony when asked if she had "any other mental or physical limitations that . . . prevent [her] from doing regular work activity"); R. 267 (Plaintiff not mentioning urge incontinence on disability report when explaining how her "conditions limit [her] ability to work"). Since the ALJ determined that Plaintiff's urge incontinence "resulted in minimal functional limitations," R. 18, and that finding was supported by substantial evidence, he did not err by failing to address whether the condition required her to spend "additional time off-task," ECF No. 14-1 at 15.

Thus, the ALJ considered Plaintiff's diabetes, obesity, and urge incontinence, and his findings regarding those conditions were adequately supported by the record.

**E. Expert Opinions**

Finally, Plaintiff argues that the ALJ improperly relied on expert opinions in formulating his decision. ECF No. 14-1. The ALJ "found persuasive" portions of the opinions of two state agency reviewers, Dr. Marcia Foster and Dr. Marcia Lipski. R. 24. Dr. Foster and Dr. Lipsky reviewed Plaintiff's records in October and December of 2020, and both concluded that she could "perform the demands of medium exertion [work]," with certain limitations. R. 24; *see* R. 73; R. 82. They "pointed to the absence of any ongoing treatment for [Plaintiff's] shoulder as

well as her ongoing history of work." R. 24; *see* R. 62-74; R. 76-83. The ALJ concluded these findings were "generally consistent with the evidence of record, which captures limited . . . acute treatment following falls, and otherwise stable treatment for [Plaintiff's] chronic conditions— diabetes, hypertension, sleep apnea and obesity." R. 24. "In this respect," the ALJ "found persuasive" the "opinions of Dr. Foster and Dr. Lipsky." R. 24.

"An ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of Social Security disability." *Grewen v. Colvin*, No. 1:11-CV-00829, 2014 WL 1289575, at *7 (N.D.N.Y. Mar. 27, 2014) (internal citation and quotation marks omitted). "If an ALJ relies on a nonexamining reviewer's opinion, that opinion must be supported by the other evidence in the record." *Id.*

Plaintiff argues that the ALJ should not have relied on the agency reviewers' opinions "because they are based on misstatements or misunderstanding of the record." ECF No. 14-1 at 11. Specifically, Plaintiff argues that (1) the agency reviewers' conclusion that Plaintiff did not receive ongoing treatment for her shoulder was not supported by the record, and (2) the agency reviewers did not speak to Plaintiff, and therefore did not know that her job permitted her an accommodation. ECF No. 14-1 at 12.

Contrary to Plaintiff's assertion, the record supports the agency reviewers' view that Plaintiff received minimal treatment for her alleged shoulder injury after her surgery. R. 72 (Dr. Foster commenting that though Plaintiff received rotator cuff surgery, she was "[o]n no pain medications, [and] has not sought care for [her right] shoulder in 2.5 years with continued work"); R. 81 (Dr. Lipski making the same comment). In the period between Plaintiff's right shoulder surgery and the agency reviewers' reports, Plaintiff received care for pain in her right

shoulder only once: after she tripped and her "right arm went through [a] fence in April of 2017." R. 305-06 (noting that Plaintiff had "[d]ecreased range of motion" and "tenderness" in her right shoulder). But an X-Ray of her shoulder at the time was normal. R. 310. In any event, this fall occurred more than 2.5 years before the agency reviewers wrote their report, and therefore does not rebut the reviewers' determination that Plaintiff "has not sought care for [her right] shoulder in 2.5 years with continued work." R. 72.

Of course, as Plaintiff points out, the agency reviewers did not have access to as much information as the ALJ. They did not have an opportunity to interview Plaintiff, and they could not consider treatment Plaintiff received after the reports were drafted, including her September 22, 2021 report of shoulder pain, R. 864. But the ALJ properly considered this additional evidence in conjunction with the agency reviewers' reports and determined that this evidence did not contravene the reviewers' RFC determination. *See* R. 21-24 (discussing Plaintiff's testimony and Plaintiff's medical history, including the September 2021 appointment). As such, the ALJ's consideration of the agency reviewers' reports, and his conclusion that some of their findings were persuasive, was reasonable.

## IV.    CONCLUSION

For the reasons explained above, the ALJ's determination that Plaintiff had the RFC for medium exertion work, with certain limitations, was supported by substantial evidence in the record. Therefore, the Plaintiff's Motion to Reverse (ECF No. 14) is DENIED and the Commissioner's Motion to Affirm the Decision (ECF No. 17) is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.

Dated:  Hartford, Connecticut                          /s/
March 13, 2024                                 Michael P. Shea, U.S.D.J.